# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HUNTON & WILLIAMS LLP, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   15-1203 (RC) |
| | : | |
| v. | : | Re Document Nos.:   36, 40, 46, |
| | : | 50, 52, 56 |
| U.S. ENVIRONMENTAL PROTECTION | : | |
| AGENCY, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HUNTON & WILLIAMS LLP, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   15-1207 (RC) |
| | : | |
| v. | : | |
| | : | |
| U.S. ARMY CORPS OF ENGINEERS, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HUNTON & WILLIAMS LLP, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   15-1208 (RC) |
| | : | |
| v. | : | |
| | : | |
| U.S. DEPARTMENT OF THE ARMY, | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM OPINION

GRANTING IN PART AND DENYING IN PART THE EPA'S MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN PART THE CORPS' MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN PART THE ARMY'S MOTION FOR SUMMARY JUDGMENT;
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ORDER
GOVERNING FURTHER PROCEEDINGS CONCERNING THE EPA;
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT CONCERNING THE CORPS;
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT CONCERNING THE ARMY

## I.  INTRODUCTION

Plaintiff Hunton & Williams LLP (Hunton) filed this action seeking documents under the Freedom of Information Act (FOIA). Hunton requested records from three agencies—the U.S. Environmental Protection Agency (EPA), the U.S. Army Corps of Engineers (Corps), and the U.S. Department of the Army (Army)—regarding the government's Clean Water Act (CWA) and Rivers and Harbors Act (RHA) jurisdiction over an industrial site in Redwood City, California. The developer of the site had requested an Approved Jurisdictional Determination (AJD) in 2012, in order to definitively establish the government's position on CWA and RHA jurisdiction. The Corps and the EPA share responsibility for issuing such AJDs.

In this case, after the Corps prepared a draft AJD addressing both CWA and RHA jurisdiction, the Army intervened to perform a "legal and policy review" in its role as the Corps' parent agency. After that legal and policy review was complete and the Corps had briefly returned to work on the AJD, the EPA stepped in and used its "special case" authority to take over the CWA portion of the AJD. As of August of 2016, the EPA had still not issued the CWA portion of the AJD.

Hunton, a law firm, submitted multiple FOIA requests for records from the EPA, the Corps, and the Army. Dissatisfied with the agencies' responses, Hunton filed this suit. Now

2

pending before the Court are motions for summary judgment by the EPA, the Army, and the

Corps, as well as Hunton's motion for partial summary judgment concerning the Corps,

Hunton's motion for partial summary judgment concerning the Amy, and Hunton's motion for

an order governing further proceedings against the EPA.[1]

As explained below, because it concludes that the agencies have not adequately justified

their application of FOIA exemptions to withhold documents, the Court will entertain supplemental

---

[1] The Court uses the following short citations to refer to the briefing filed in this case.
With respect to the EPA:
- Mem. P. & A. Supp. Def.'s Mot. Summ. J. (EPA MSJ), ECF No. 40.
- The memorandum docketed as Hunton's opposition at ECF No. 49 is identical to the Hunton's supporting memorandum at ECF No. 50. The Court cites exclusively to ECF No. 50.
- Pl.'s Mem. P. & A. Opp'n to Def. U.S. EPA's Mot. Summ. J. & Supp. Pl.'s Mot. Order Gov. Further Proceedings (Pl.'s Mot. Order EPA), ECF No. 50.
- Def.'s Opp'n Pl.'s Mot. Gov. Further Proceedings & Reply Supp. Def.'s Mot Summ. J. (EPA Reply), ECF No. 57.

With respect to the Corps:
- Mem. P. & A. Supp. Def.'s Mot. Summ. J. (Corps MSJ), ECF No. 52.
- The memorandum docketed as Hunton's opposition at ECF No. 55 is identical to Hunton's supporting memorandum at ECF No. 56. The Court cites exclusively to ECF No. 56.
- Pl.'s Mem. P. & A. Opp'n Def. U.S. Army Corps' Mot. Summ. J. & Supp. Pl.'s Mot. Partial Summ. J. (Pl.'s MPSJ Corps), ECF No. 56.
- Reply Supp. Pl.'s [sic] Mot. Summ. J. & Opp'n Pl.'s Partial Mot. Summ. J. (Corps Reply), ECF No. 59.
- Pl.'s Reply Mem. Supp. Pl.'s Mot. Partial Summ. J. (Pl.'s Reply Corps), ECF No. 60.

With respect to the Army:
- Mem. P. & A. Supp. Def.'s Mot. Summ. J. (Army MSJ), ECF No. 36.
- The memorandum docketed as Hunton's opposition at ECF No. 45 is identical to Hunton's supporting memorandum at ECF No. 46. The Court cites exclusively to ECF No. 46.
- Pl.'s Mem. P. & A. Opp'n Def. U.S. Army's Mot. Summ. J. & Supp. Pl.'s Mot. Partial Summ. J. (Pl.'s MPSJ Army), ECF No. 46.
- Def.'s Opp'n Pl.'s Mot. Partial Summ. J. & Reply Supp. Def.'s Mot. Summ. J. (Army Reply), ECF No. 51.
- Pl.'s Relpy Mem. Supp. Pl.'s Mot. Partial Summ. J. (Pl.'s Reply Army), ECF No. 54.

briefing and review selected documents *in camera*. However, the Court concludes that the agencies' searches were adequate. The motions are thus granted in part and denied in part.[2]

## II.  BACKGROUND

Hunton filed FOIA requests seeking information relating to the AJD for an industrial site in Redwood City, California.[3] Compl. ¶ 5, ECF No. 1.[4] The site, located near the San Francisco harbor, serves as an active saltworks and contains pools of water and salty brine. Compl. ¶ 6. The agencies refer to the site by a variety of names, including the Salt Plant, Saltworks, Redwood City, and Cargill. Compl. ¶ 5. The developers of the site sought an AJD to determine if the site was covered by the Clean Water Act (CWA)—a highly technical issue turning on whether the site contains "waters of the United States." Compl. ¶¶ 6, 9. An AJD would establish the government's position on the jurisdiction of both the CWA and the Rivers and Harbors Act (RHA). Compl. ¶ 9. The AJD at issue was requested on May 29, 2012, Compl. ¶ 9, and remained pending until at least August of 2016, EPA Reply at 18, ECF No. 57—a total time of more than 1500 days.

Three agencies—the Corps, the EPA, and the Army—played a role in this lengthy process. Typically, the EPA and the Corps share responsibility for issuing AJDs. Compl. ¶ 9. For the AJD at issue, the Corps informed the developers that it would take the lead with the EPA providing the Corps with "technical support." Compl., Ex. A, ECF No. 1-1. The Corps began

---

[2] Although Hunton has requested oral argument on the motions, the Court finds that oral argument would not assist it in rendering a decision. *See* LCvR 7(f).

[3] To provide context to Hunton's FOIA requests, the Court cites to background facts from Hunton's complaint, none of which are disputed by the agencies.

[4] Unless otherwise noted, all record citations are to the main docket for this consolidated case—No. 15-cv-1203. As noted, some filings refer to dockets No. 15-cv-1207 or No. 15-cv-1208.

work, and in May of 2014 was apparently "on the verge" of issuing an AJD determining both RHA and CWA jurisdiction. Compl. ¶¶ 15–16.

But the AJD did not issue in May of 2014. Instead, the Assistant Secretary of the Army for Civil Works (ASA(CW)) used her "oversight responsibility" over the Corps to conduct a "legal and policy review" of the AJD process, with the effect of delaying the AJD's issuance. Decl. of Paul DeAgostino (DeAgostino Decl.) ¶ 21, ECF No. 36-2; Compl. ¶¶ 21, 24. According to the ASA(CW), this review "only considered the procedural aspects of the determination and did not in any way consider the substantive question of whether the property in question is in fact jurisdictional." Darcy Mem. for the Chief of Engineers at 1, Ex. 1, ECF No. 46-1. The Army completed its "legal and policy review" in November of 2014 and the Corps once again returned to the AJD process. Compl. ¶ 24. In November of 2014, the Corps sent the EPA a "draft AJD" covering both RHA and CWA jurisdiction with the stated intent of issuing it in December of 2014. Pl.'s MSJ Against Corps, Ex. C, ECF No. 56-3. However, another delay arose. On March 18, 2015 the Corps informed the EPA that the Corps had "arrived at a decision" to "finalize and sign [the AJD] tomorrow." Pl.'s Reply Army, Ex. E, ECF No. 54-5.

On the eve of this planned issuance, the EPA used its "special case" authority to take over the CWA portion of the AJD. Brush Decl., Ex. E at 16, ECF No. 40-3; *see also* Mem. Agreement, Ex. 2, ECF No. 57-1. The Corps retained the authority to determine RHA jurisdiction, and issued an AJD with respect to the RHA on March 19, 2015. Compl. ¶ 27. The special case authority is typically used when "significant issues or technical difficulties are anticipated or exist, concerning the determination of the geographic jurisdictional scope of waters of the United States." Mem. Agreement. A few months later, in June of 2015, the

agencies published a new rule altering the definition of "waters of the United States" in the

CWA. *See generally* 33 C.F.R. § 328 (2015).

As of the briefing of these motions, the CWA portion of the Redwood City AJD had still

not been issued by the EPA. EPA Reply at 18, ECF No. 57. Seeking insight into the EPA and the

Corps' decisionmaking with respect to the Redwood City site, Hunton submitted multiple FOIA

requests to the EPA, the Corps, and the Army. Nine of those requests are at issue here.

### A.  FOIA Requests to the EPA

Four of Hunton's FOIA requests to the EPA are at issue in this suit. First, on May 30,

2014, Hunton submitted FOIA requests to the EPA seeking[5]:

> 1. Any and all documents related to the DMB Redwood City Salt Plant (also
> known as DMB Redwood City Saltworks project, Redwood City Saltworks
> project site, Redwood City salt production facilities, or Cargill operations in
> Redwood City) since January 1, 2014.

> 2. Any and all communications between EPA (all offices) and the other parties,
> including but not limited to the Corps (all offices), the Department of the Army
> (all offices, including the Office of the Assistant Secretary of the Army for Civil
> Works), Congress (members and staff), other Executive Branch employees, and
> non-government third parties, related to the DMB Redwood City Salt Plant (also
> known as DMB Redwood City Saltworks project, Redwood City Saltworks
> project site, Redwood City salt production facilities, or Cargill operations in
> Redwood City) since January 1, 2014.

> 3. Any request (other than this letter) from any entity or person for any documents
> relating to the DMB Redwood City Salt Plant (also known as DMB Redwood
> City Saltworks project, Redwood City Saltworks project site, Redwood City salt
> production facilities, or Cargill operations in Redwood City) received on or after
> January 1, 2014, and all documents, communications, and records relating to such
> a request, including any response by EPA to that request.

Compl., Ex. E, ECF No. 1-5.

---

[5] Hunton served identical copies of this FOIA request on the EPA Headquarters and EPA
Region 9. Decl. Jason Brush (Brush Decl.) ¶¶ 12-15, ECF No. 40-2. The EPA merged the
requests and treated them as a single request with reference number EPA-R9-2014-006943.
Brush Decl. ¶ 12.

Next, Hunton sought the same records as in its initial request, but twice expanded the

applicable date range to cover any documents created since the previous FOIA requests: on

August 19, 2014, Hunton requested documents "since May 30, 2014,"[6] Compl., Ex. H, ECF No.

1-8; and, on March 19, 2015, Hunton requested documents "since August 19, 2014."[7]

On March 23, 2015, Hunton submitted a fourth request to the EPA seeking:[8]

> the Corps' "final" CWA JD (with attachments) and/or "final" combined RHA and
> CWA JD (with attachments) for Redwood City Saltworks. By "final," we mean
> the version of the document that was prepared for signature by Major General Peabody
> (whether or not the document was ever actually signed), and sent to the EPA.

Compl., Ex. N, ECF No. 1-14 (footnotes omitted). Hunton appealed each of the four requests

administratively. Brush Decl. ¶ 29, ECF No. 40-2. The exhaustion of administrative remedies is

not at issue here.[9]

Between June 2014 and June 2015, the EPA produced documents relating to Hunton's

first three FOIA requests. Compl. ¶¶ 30, 48. To do so, EPA searched specific employee's

---

[6] Hunton once again served identical copies of this FOIA request on the EPA
Headquarters and EPA Region 9. Brush Decl. ¶ 13. These requests were again combined by the
EPA as EPA-R9-2014-9624. Brush Decl. ¶ 13.

[7] Hunton once again served identical copies of this FOIA request on the EPA
Headquarters and EPA Region 9. Brush Decl. ¶ 14. In this case, the EPA Region 9 request (EPA-
R9-2015-005422) was completed first while the Headquarters request (EPA-HQ-2015-5242)
remained pending. Brush Decl. ¶ 14. Only the Region 9 request appears to be at issue in this
litigation. *See* Brush Decl. ¶ 14 (noting that Region 9 completed its processing on June 12, 2015
while Hunton agreed to allow the EPA to continue processing the Headquarters request after
initiating this lawsuit).

[8] This request was labelled by the EPA as EPA-R9-2015-5491. Brush Decl. ¶ 15.

[9] The appeal on the fourth request, for the "final" AJD, was denied by the EPA on July
13, 2015. Brush Decl. ¶ 29. The other administrative appeals were still pending when this lawsuit
was filed. Brush Decl. ¶ 29.
    Although the EPA asserts that Hunton failed to exhaust its administrative remedies on the
adequacy of the EPA's search for responsive records, EPA MSJ at 12, ECF No. 40, Hunton does
not appear to challenge the adequacy of the EPA's search and the Court thus need not resolve
this issue.

accounts in its email system using various search terms. Brush Decl. ¶ 16. "[C]ustodians" at EPA

Region 9 and the EPA headquarters were also instructed "to search for and collect other responsive

files that would not be contained in the email system" in response to these three requests. Brush

Decl. ¶ 17. The EPA produced about 600 documents in full, withheld 12 documents in full, and

withheld 320 documents in part. Brush Decl. ¶ 31. Of the withheld information, the information

in 314 documents was withheld on the basis of the deliberative process privilege, the information

in 23 documents was withheld on the basis of the attorney–client privilege, and the information

in 23 documents was withheld on the basis of the attorney work-product privilege. Brush Decl. ¶ 31.

With respect to the fourth FOIA request, the EPA denied the March 23, 2015 request for

the "final" AJD. Compl. ¶¶ 51–52. The EPA located the document using a manual search, but

withheld it in its entirety under the deliberative process privilege. Brush Decl. ¶ 23.[10]

## B.  FOIA Requests to the Corps

Four of Hunton's FOIA requests to the Corps are at issue here. First, on May 30, 2014,

Hunton submitted a FOIA request to the Corps seeking:[11]

> 1. Any and all documents related to the DMB Redwood City Salt Plant (also
> known as DMB Redwood City Saltworks project, Redwood City Saltworks
> project site, Redwood City salt production facilities, or Cargill operations in
> Redwood City) since January 1, 2014.
>
> 2. Any and all communications between Corps (all offices) and the other parties,
> including but not limited to EPA (all offices), the Department of the Army (all
> offices, including the Office of the Assistant Secretary of the Army for Civil
> Works and the Office of the General Counsel), Congress (members and staff),
> other Executive Branch employees, and non-government third parties, related to
> the DMB Redwood City Salt Plant (also known as DMB Redwood City Saltworks

---

[10] Although the EPA did not locate the attachments enumerated in Hunton's request,
Hunton has not pressed that issue here and may have received them from a different agency. *See*
Brush Decl. ¶ 23.

[11] Hunton served identical copies of this FOIA request on the San Francisco and South
Pacific Districts of the Corps, as well as Corps HQ. 15-cv-1207, Compl. ¶ 29, ECF No. 1. The
Corps combined the requests as FP-14-021113. 15-cv-1207, Compl. ¶ 29, ECF No. 1.

project, Redwood City Saltworks project site, Redwood City salt production facilities, or Cargill operations in Redwood City) since January 1, 2014.

3. Any request (other than this letter) from any entity or person for any documents relating to the DMB Redwood City Salt Plant (also known as DMB Redwood City Saltworks project, Redwood City Saltworks project site, Redwood City salt production facilities, or Cargill operations in Redwood City) received on or after January 1, 2014, and all documents, communications, and records relating to such a request, including any response by the Corps to that request.

15-cv-1207, Compl., Ex. E., ECF No. 1-5. As is evident from the request, Hunton sought the same information from the Corps as it did in its request to the EPA.

Next, Hunton sought the same records as in its initial request, but thrice expanded the applicable date range to cover any document created after the previous FOIA request: on August 19, 2014, Hunton requested documents "since May 30, 2014," 15-cv-1207, Compl., Ex. F, ECF No. 1-6;[12] on March 19, 2015, Hunton requested documents "since August 19, 2014," 15-cv-1207, Compl., Ex. G, ECF No. 1-7; 15-cv-1207, Compl. ¶ 43;[13] and on June 12, 2015, Hunton requested documents "since March 19, 2015," and added the Office of the General Counsel within the Department of the Army to the list of enumerated offices. 15-cv-1207, Compl., Ex. H, ECF No. 1-8; 15-cv-1207, Compl. ¶ 46.[14]

Between April 2015 and April 2016, the Corps released 20,448 pages of documents. *See* Bartlett Decl. ¶ 8. The Corps identified a set of likely custodians within each office and used search terms to search their files and email. Bartlett Decl. ¶¶ 10–23. The search identified 22,776 pages of responsive documents. Bartlett Decl. ¶ 24. Information was withheld under FOIA

---

[12] Hunton once again served three identical copies of this FOIA request that were combined by the Corps as FP-14-031623. 15-cv-1207, Compl. ¶¶ 36-37.

[13] The Corps consolidated this request with the second request and assigned it the same tracking number, "[b]ecause [it] had not yet conducted a search for Request 2." Decl. Michelle Bartlett (Bartlett Decl.) ¶ 6, ECF No. 52-2.

[14] The Corps handled this request as FP-15-022252. Bartlett Decl. ¶ 7.

Exemptions 5 and 6. Bartlett Decl. ¶¶ 28–34. The Corps determined that there was only one

"record custodian [who] appeared to have conducted any business using a personal email

account." Second Decl. Michelle Bartlett (2d Bartlett Decl.) ¶ 7, ECF No. 59-1. That custodian

searched her personal email, but did not identify any previously undisclosed responsive

documents. 2d Bartlett Decl. ¶ 7.

### C.  FOIA Requests to the Army

Only one FOIA request to the Army is at issue here. On March 19, 2015, Hunton

submitted a FOIA request to the Army seeking:

> 1. Any and all documents related to the DMB Redwood City Salt Plant (also
> known as DMB Redwood City Saltworks project, Redwood City Saltworks
> project site, Redwood City salt production facilities, or Cargill operations in
> Redwood City).

> 2. Any and all communications between the Department of the Army (all offices,
> including the Office of the Assistant Secretary of the Army for Civil Works and
> the Office of the General Counsel) and the other parties, including but not limited
> to EPA (all offices), the Corps of Engineers (all offices), Congress (members and
> staff), other Executive Branch employees, and non-government third parties,
> related to the DMB Redwood City Salt Plant (also known as DMB Redwood City
> Saltworks project, Redwood City Saltworks project site, Redwood City salt
> production facilities, or Cargill operations in Redwood City).

> 3. Any request (other than this letter) from any entity or person for any documents
> relating to the DMB Redwood City Salt Plant (also known as DMB Redwood
> City Saltworks project, Redwood City Saltworks project site, Redwood City salt
> production facilities, or Cargill operations in Redwood City) and all documents,
> communications, and records relating to such a request, including any response by
> the Department to that request.

15-cv-1208, Compl., Ex. E, ECF No. 1-5.

The Army did not release any documents to Hunton before the complaint in this action

was filed. 15-cv-1208, Compl. ¶ 31, ECF No. 1; 15-cv-1203, Answer ¶ 31, ECF No. 16. After

this lawsuit was initiated, the Army identified 3852 pages of responsive documents and released

2422 pages of materials between November 2015 and January of 2016. DeAgostino Decl. ¶¶ 5,
15, ECF No. 36-2.

The Army searched for responsive documents within the Office of the ASA(CW) and
within the Office of General Counsel (OGC), the two locations it determined were likely to have
responsive documents. DeAgostino Decl. ¶ 6. The Army identified likely custodians in each
office and applied various search terms to their files. DeAgostino Decl. ¶¶ 7–11. The Army also
used search terms to search those custodians' files with the Defense Information Systems
Agency—the email provider for the OGC and ASA(CW). DeAgostino Decl. ¶ 12. The Army
withheld a variety of documents from its disclosure under FOIA Exemptions 5 and 6.
DeAgostino Decl. ¶¶ 17–18. The Army supplemented its initial search by searching the personal
email of a particular employee who had used a personal email account to conduct agency
business. *Compare* Pl.'s Reply Army at 3, ECF No. 54, *with* Schmauder Decl. ¶ 4, ECF No. 61.
The Army searched the personal email account for the terms "Cargill," "Saltworks," and
"Redwood City," but found only previously released emails. Schmauder Decl. ¶ 4.

### D.  Procedural History

All three agencies move for summary judgment on the grounds that they performed
adequate searches, appropriately withheld information pursuant to FOIA exemptions, and
released all reasonably segregable material. Army MSJ, ECF No. 36; EPA MSJ, ECF No. 40;
Corps MSJ, ECF No. 52. Against the EPA, Hunton seeks an order denying summary judgment
and granting *in camera* review of the material the EPA withheld. Pl.'s Mot. Order EPA, ECF No.
50. Against the Corps, Hunton moves for partial summary judgment, seeking an order
documenting violations of FOIA, re-review and production of materials currently withheld as
non-responsive, and either production or *in camera* review of materials withheld under

Exemption 5. Pl.'s MPSJ Corps, ECF No. 56. Against the Army, Hunton moves for partial

summary judgment seeking an order documenting violations of FOIA, release of the names

redacted under Exemption 6, and either production or *in camera* review of materials withheld

under Exemption 5. Pl.'s MPSJ Army, ECF No. 46. Those motions are now ripe for decision.

The Court reviews the applicable legal standard before analyzing the merits of the

parties' positions.

## III.  LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Def. of Wildlife v. U.S. Border Patrol*, 623 F.Supp.2d 83, 87 (D.D.C. 2009). Summary judgment

is appropriate when "the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material"

fact is one capable of affecting the substantive outcome of the litigation. *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a

reasonable jury to return a verdict for the non-movant. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of

factually unsupported claims or defenses and determining whether there is a genuine need for

trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). In considering a motion for

summary judgment, a court must "eschew making credibility determinations or weighing the

evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and

inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477

U.S. at 255.

When assessing a summary judgment motion in a FOIA case, a court makes a *de novo*

assessment of whether the agency has properly withheld the requested information. *See* 5 U.S.C.

§ 552(a)(4)(B); *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 598 F. Supp. 2d 93, 95

(D.D.C. 2009). To prevail on a motion for summary judgment, "the defending agency must

prove that each document that falls within the class requested either has been produced, is

unidentifiable or is wholly exempt from the Act's inspection requirements." *Weisberg v. U.S.*

*Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (internal quotation marks omitted) (quoting

*Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)). To meet its burden, a

defendant may rely on declarations that are reasonably detailed and non-conclusory. *See Citizens*

*for Responsibility & Ethics in Wash. v. U.S. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C.

2007) ("[T]he Court may award summary judgment solely on the basis of information provided

by the department or agency in declarations when the declarations describe 'the documents and

the justifications for nondisclosure with reasonably specific detail, demonstrate that the

information withheld logically falls within the claimed exemption, and are not controverted by

either contrary evidence in the record nor by evidence of agency bad faith.'" (quoting *Military*

*Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981))). "Ultimately, an agency's

justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"

*Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100,

1105 (D.C. Cir. 1982)). Generally, a reviewing court should "respect the expertise of an agency"

and not "overstep the proper limits of the judicial role in FOIA review." *Hayden v. Nat'l Sec.*

*Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

        Even if the nonmovant does not respond to the motion for summary judgment, the court

cannot grant the motion for the reason that it was conceded. *See Winston & Strawn, LLP v.*

*McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) ("Under the Federal Rules of Civil Procedure, a

motion for summary judgment cannot be 'conceded' for want of opposition. 'The burden is

always on the movant to demonstrate why summary judgment is warranted. The nonmoving party's failure to oppose summary judgment does not shift that burden.' The District Court 'must always determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" (quoting *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring) and citing Fed. R. Civ. P. 56(e)(3))).

## IV.  ANALYSIS

Hunton disputes the adequacy of the agencies' searches, as well as the agencies' use of FOIA Exemptions 5 and 6. The Court addresses adequacy first, and concludes that the agencies' searches were adequate. The Court then turns to the agencies' withholdings, and concludes that no agency has fully justified its withholdings, and thus *in camera* review and further briefing will be appropriate.

### A.  Adequacy of the Search

Hunton argues that the agencies' searches were inadequate in two ways—first, because the agencies did not sufficiently search employees' personal communications, such as personal email accounts and text messages; and second, because the Corps artificially limited the number of custodians that it searched.

Although Hunton does not, in general, challenge the adequacy of the agencies' searches, the Court nonetheless conducts an independent evaluation to determine whether the record and undisputed material facts justify granting summary judgment. Under FOIA, an adequate search is one that is "reasonably calculated to uncover all relevant documents." *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (internal quotation mark omitted) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). The agency need not search "every record system" for the requested documents, but it "must conduct a good faith, reasonable search of

those systems of records likely to possess the requested records." *Marino v. Dep't of Justice*, 993

F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C.

Cir. 1990)). When an agency seeks summary judgment on the basis that it conducted an adequate

search, it "may rely on a 'reasonably detailed affidavit, setting forth the search terms and the type

of search performed, and averring that all files likely to contain responsive materials (if such

records exist) were searched.'" *DiBacco v. U.S. Army*, 795 F.3d 178, 188 (D.C. Cir. 2015)

(quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999)). Once the

agency has provided a reasonably detailed affidavit describing its search, the burden shifts to the

FOIA requester to produce "countervailing evidence" suggesting that a genuine dispute of

material fact exists as to the adequacy of the search. *Morley*, 508 F.3d at 1116.

   In general, the agencies' searches are adequate. Each agency has provided a declaration

describing its search in reasonable detail and explaining how that search was reasonably

calculated to uncover all responsive documents. For example, the EPA provided a declaration

describing its search process for records responsive to request EPA-R9-2014-006943. The EPA

"focused on e-mail correspondence as the location most likely to contain the majority of

responsive records" and therefore used a "centralized tool" to search the EPA's email system

using the keywords "Cargill," "Redwood City," "salt pond," "DMB," and "Saltworks." Brush

Decl. ¶ 16, ECF No. 40-2. In addition, "custodians [] search[ed] for and collect[ed] other

responsive files that would not be contained in the email system (such as word processing

documents or hard copy documents)."[15] Brush Decl. ¶ 17. Upon its independent evaluation—and

---

[15] The Corps and the Army similarly provided declarations describing their searches. For example, in response to request FP-14-021113, the Corps determined "that all responsive documents would reasonably be found within the Regulatory Office, Chief Counsel's Office, and the Executive Office." Bartlett Decl. ¶ 10, ECF No. 52-2. Within each office, the Corps identified two or three custodians to "reasonably identify[] all responsive documents" while

in the absence of countervailing evidence from Hunton—the Court thus concludes that the agencies' searches were, in general, reasonably designed to locate all responsive documents and that the record thus demonstrates that the agencies are entitled to summary judgment.

\*      \*      \*

Having concluded that the agencies' searches were generally adequate, the Court addresses Hunton's specific objections. First, Hunton argues that the Corps and the Army did not adequately search non-official channels of communication. Second, Hunton asserts that the Corps improperly limited the number of custodians that it searched.

### 1. Personal Communications

Hunton disputes the adequacy of the Corps' and the Army's searches on the grounds that neither included "non-official channels, such as personal email, text messages, or the like." Pl.'s MPSJ Corps at 19, ECF No. 56; Pl.'s MPSJ Army at 23, ECF No. 46. As noted previously, the agency bears the initial burden of demonstrating, typically through declarations, that it has performed an adequate search. Once the agency has met that burden—as it has here—the burden

---

avoiding "duplicate information and processing time." Bartlett Decl. ¶ 10. The custodians "searched their email (inbox, sent mail, and archives) and electronic documents on their computer as well as hard copy files they maintained." Bartlett Decl. ¶ 23. The keywords used always included "Redwood," and also included "Redwood City," "Salt Works," "Salt Ponds," "south bay," "lawsuits," "litigation," "jurisdictional determination," and "JD," based on the custodian. Bartlett Decl. ¶ 23.

For the Army's search, the Army "determined that all responsive documents would reasonably be found within the office of the ASA(CW) or the Office of the Army General Counsel (OGC)." DeAgostino Decl. ¶ 6, ECF No. 36-2. Custodians within the OGC were identified, and their "emails, hard-drives and network drives" were searched for records. DeAgostino Decl. ¶ 7. Search terms used included "Cargill" and "Redwood City." DeAgostino Decl. ¶ 8. Custodians were also identified within the ASA(CW), and their files were searched. DeAgostino Decl. ¶ 13. The ASA(CW) shared drive was also searched for the terms "Hunton," "Williams," "Cargill," "Redwood," and "salt." DeAgostino Decl. ¶ 14. The Army's email system was also searched for the terms "Redwood City," "saltworks," "Pacific Ventures," "Westpoint Slough," "Cargill," and "salt plant" for a specific list of custodians. DeAgostino Decl. ¶ 12.

shifts to the FOIA requester to produce "countervailing evidence" showing a genuine dispute of material fact as to the adequacy of the search. *Morley*, 508 F.3d at 1116.

The D.C. Circuit has suggested that a requester can satisfy its burden to present "countervailing evidence" in the context of personal email accounts by identifying evidence that a specific private email address has been used for agency business. *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 827 F.3d 145, 146 (D.C. Cir. 2016). Mere speculation, however, that private email accounts were used does not require the agency to perform a search. *See Wright v. Admin. for Children & Families*, No. 15-218, 2016 WL 5922293, at *8–9 & n.5 (D.D.C. Oct. 11, 2016) (rejecting "the plaintiff's purely speculative contentions" that personal email was used because "[t]he plaintiff misconstrues the nature of his burden to submit 'countervailing evidence' to raise a 'substantial doubt' as to the adequacy of the agency's search" and "the plaintiff has not overcome the presumption that agency records are unlikely to exist on the agency employees' personal accounts").

Here, the Corps initially searched the personal email account of one particular employee because that employee "appeared to have conducted . . . business using a personal email account."[16] 2d Bartlett Decl. ¶ 7, ECF No. 59-1. The search did not identify any additional responsive documents. 2d Bartlett Decl. ¶ 7, ECF No. 59-1.

The Army did not initially perform any searches for personal emails, but did perform a supplemental search after Hunton identified emails in the Army's releases that had been sent from a personal email account. Pl.'s Reply Army at 3, ECF No. 54. The Army's supplemental search covered that particular account and used the search terms "Cargill," "Saltworks," and

---

[16] Presumably this employee was identified through an examination of the "to" and "from" fields in the responsive emails.

"Redwood City." Schmauder Decl. ¶ 4, ECF No. 61. That search discovered only the previously released emails. *See* Schmauder Decl. ¶ 4 (indicating that Mr. Schmauder "do[es] not routinely use [his] personal emails to conduct professional business"); *see generally* Schmauder Decl.

Both agencies have thus performed searches when specific facts indicated that a particular employee had used a personal email account for agency business. Hunton identifies no other particular employees whose accounts it asserts should be searched, or other specific facts in the record indicating that personal email accounts were used. Hunton seeks to require the agencies to search other personal email accounts—presumably those for all employees identified as having been involved with the Saltworks issues—even in the absence of any indication that any such personal accounts were used for agency business. This goes too far. Unlike the requestor in *Competitive Enterprise Institute*, Hunton is unable to identify any "countervailing evidence" of personal email use. *Cf.* 827 F.3d at 146. Indeed, Hunton states merely that that "it is *plausible* that non-formal channels may have been utilized here." Pl.'s MPSJ Corps at 20 (emphasis added). Here, as in *Wright*, the Court finds that Hunton's purely speculative claims are insufficient to overcome the presumption that the agency's search was adequate.[17] *Cf. Wright*, 2016 WL 5922293, at *8–9. Because the Court finds that the agencies have adequately searched for responsive personal emails, it need not address the Corps' and the Army's argument that they

---

[17] Of course, when a requestor identifies a "gap" in the agency's search—such as an additional record system—the agency must make efforts to "fill" that gap, including explaining whether the other record system exists, if so, whether it is reasonably likely to provide additional responsive material, and, if so, what practical obstacles exist to a search. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514–15 (D.C. Cir. 2011). Here, to the extent that personal email accounts constitute an additional record system, the agencies' declarations attesting that such accounts will not provide additional responsive material because all work was conducted through agency email accounts are entitled to a presumption of good faith that can be upset only by the provision of countervailing evidence by Hunton.

need not search personal email accounts because it is "unlikely" that they control them.[18] Corps Reply at 18, ECF No. 59; Army Reply at 10, ECF No. 51.

Next, Hunton argues that the agencies should be required to search for responsive text messages. Pl.'s MPSJ Army at 23–24, ECF No. 46; Pl.'s MPSJ Corps at 19–20. However, as with emails, Hunton does not present countervailing evidence to overcome the presumption inherent in the agency's declarations that all sources of responsive records were searched. Hunton does not point to any evidence indicating that text messages were used for agency business or otherwise show that searching text messages would be likely to lead to responsive documents. Unlike email messages, no evidence in the record suggests that any agency employees used text messages to conduct official business. The Court therefore finds that Hunton's speculative arguments about the possible existence of text messages are insufficient, and the undisputed facts in the record—including the agency's declarations—demonstrate that the agencies are entitled to summary judgment as to the adequacy of their search.

Finally, Hunton's requests for discovery regarding personal communications channels are denied as to both the Army and the Corps. "Discovery is the exception, not the rule, in FOIA cases." *Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 183 (D.D.C. 2013) (noting that "discovery is an extraordinary procedure in a FOIA action" (quoting *Thomas v. FDA*, 587 F. Supp. 2d 114, 115 (D.D.C. 2008))). Here, the Court has determined that the agency's

---

[18] The Court notes, however, that an "agency cannot shield its records from search or disclosure under FOIA by the expedient of storing them in a private email account." *Competitive Enter. Inst.*, 827 F.3d at 146; *see also Landmark Legal Found. v. EPA*, 959 F. Supp. 2d 175, 181–83 (D.D.C. 2013) (permitting a FOIA plaintiff limited discovery due to the agency's failure to search personal email accounts despite evidence that agency employees used their personal email for official business).

declarations are sufficient to support a finding that their search of personal communication

channels was adequate, and discovery is thus not appropriate.

### 2.   The Corps' Selection of Custodians

Hunton objects that the Corps wrongfully limited the number of custodians whose

records it searched. Pl.'s MPSJ Corps at 20. However, the Court finds that Hunton agreed to a

limited list of custodians—subject to Hunton's right to suggest additional custodians, which it

never exercised.

The Corps identified seven custodians at Headquarters whose records were searched.[19]

Bartlett Decl. ¶ 10, ECF No. 52-2; *see also* 2d Bartlett Decl. ¶ 6, ECF No. 59-1. The Corps

emailed Hunton its proposed list of custodians, and Hunton agreed that the Corps could

"prioritize" the seven Headquarters custodians. Pl.'s MPSJ Corps, Ex. F, ECF No. 56-6. Hunton

"reserve[d] the right to ask that [the Corps] provide documents from additional custodians at a

later date." Pl.'s MPSJ Corps, Ex. F. The Corps asserts—and Hunton does not dispute[20]—that

Hunton never requested the inclusion of any additional custodians. 2d Bartlett Decl. ¶ 6.

According to the Corps, the email exchange and several phone calls resulted in "the

understanding between both parties that if [Hunton] decided they wanted to expand the scope of

the search beyond the agreed to records custodians they would so notify [the Corps]." 2d Bartlett

Decl. ¶ 6. The Court agrees with this interpretation. While Hunton may not have consented to an

---

[19] The Corps also appears to have limited the number of custodians whose records were searched at the South Pacific Division and the San Francisco District Office. *See* Bartlett Decl. ¶ 14 (listing seven custodians identified for the South Pacific Division), ECF No. 52-2; Bartlett Decl. ¶ 19 (listing seven custodians identified for the San Francisco District Office). However, in an email exchange, Hunton informed the Corps that "we want documents from all custodians from the [South Pacific] District and [San Francisco] Division," and the Corps replied "That was previously understood and executed." Pl.'s MPSJ Corps, Ex. F, ECF No. 56-6.

[20] In fact, Hunton abandons its arguments about the Corps' limitation of custodians in its reply. *See generally* Pl.'s Reply Corps, ECF No. 60.

unconditional limitation, it did agree that it would inform the Corps if it sought records from additional custodians. Hunton never exercised this right, and thus cannot object to the Corps proceeding with only the original list. *Cf. Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 152 (D.D.C. 2010) ("Having agreed to that interpretation [of his FOIA request], [the plaintiff] cannot now argue that he meant something else."), *aff'd*, No. 10-5295, 2010 WL 5479580 (D.C. Cir. Dec. 30, 2010); *Kenney v. U.S. Dep't of Justice*, 603 F. Supp. 2d 184, 189 (D.D.C. 2009) ("Plaintiff cannot allege that the agency failed to produce responsive records, when the records he now identifies fall outside the scope of his appropriately narrowed request."). Because "[t]he adequacy of the search, . . . is judged by a standard of reasonableness and depends, . . . upon the facts of each case," *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994), and the Corps performed a reasonable search here, the Court grants the Corps summary judgment as to the adequacy of its search.

### B.  Propriety of the Agencies' Withholdings under FOIA Exemptions

The three agencies applied FOIA Exemptions 5 and 6 to withhold records. Hunton objects to the agencies' use of these exemptions. In addition to Hunton's challenges to the general application of each exemption, Hunton also argues that three specific types of records were wrongfully withheld by the agencies under Exemption 5—the "final draft" AJD created by the Corps, documents relating to the EPA's use of its special case authority, and documents relating to the Army's legal and policy review. The Court concludes that the agencies' *Vaughn* indices[21] and declarations are insufficient to justify their use of their claimed exemptions, and therefore denies the agencies summary judgment.

---

[21] A *Vaughn* index, named after the case *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), is an itemized list that correlates each document subject to withholdings with the applied exemptions and the justification for non-disclosure.

"[D]isclosure, not secrecy, is the dominant objective of [FOIA]." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). "Consistent with this purpose, agencies may withhold only those documents or portions thereof that fall under one of nine delineated statutory exemptions." *Elliott v. USDA*, 596 F.3d 842, 845 (D.C. Cir. 2010) (citing 5 U.S.C. § 552(b)). "[T]he exemptions are 'explicitly exclusive.'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989) (quoting *FAA Adm'r v. Robertson*, 422 U.S. 255, 262 (1975)). The agency bears the burden of showing that an exemption applies. *Elliott*, 596 F.3d at 845 (citing 5 U.S.C. § 552(a)(4)(B)). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted).

Hunton challenges the agencies' use of Exemptions 5 and 6. The Court addresses each exemption in turn, beginning with Exemption 5. Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption protects documents "normally privileged in the civil discovery context," *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004), such as materials shielded by the attorney–client privilege, the attorney work-product privilege and "what is sometimes called the 'deliberative process' privilege," *U.S. Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). In other words, Exemption 5 covers "those documents, and only those documents, normally privileged in the civil discovery context." *Loving v. U.S. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008) (citations omitted). All three of these aspects of Exemption 5 are at issue here.

22

1.  The Deliberative Process Privilege

Hunton challenges all three agencies' withholdings based on the deliberative process privilege. The Court agrees that all three agencies have not provided sufficiently detailed explanations of their withholdings under the privilege.

The deliberative process privilege "covers documents reflecting advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). The purpose of the exemption is to protect the decisionmaking process within the agency. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). In order to withhold information pursuant to the privilege, an agency must demonstrate that the information is both (1) predecisional, or "generated before the adoption of an agency policy," and also (2) deliberative, or "reflect[ing] the give-and-take of the consultative process." *Id.*[22]

When the deliberative process privilege is at issue, the need for an agency to describe all of the information it withheld is "particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" *Animal Legal Def. Fund v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States*, 617 F.2d at 867). If the agency does not provide "'the minimal information necessary to make a determination' concerning applicability of the deliberative process privilege" then the court should deny the agency summary judgment. *See Elec. Frontier Found.*

---

[22] Congress recently amended the FOIA to remove protection for records withheld under the deliberative process privilege that were "created 25 years or more before the date on which the records were requested." FOIA Improvement Act of 2016, Pub. L. No. 114–185, § 2(2), 130 Stat. 538 (enacted June 30, 2016). Consideration of this amendment is unnecessary because Hunton seeks only documents created after 2014.

*v. U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 173 (D.D.C. 2011) (quoting *Coastal States*, 617 F.2d at 861).

      To justify its application of the deliberative process privilege, an agency must address the following areas: "(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient." *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013) (*citing Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987); *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257–58 (D.C. Cir. 1982); *Coastal States*, 617 F.2d at 867–68). In addition, other courts in this jurisdiction have held, and the D.C. Circuit has suggested, that "the agency must make the additional showing that disclosure would cause injury to the decisionmaking process." *Nat'l Sec. Archive v. CIA*, 859 F. Supp. 2d 65, 70 (D.D.C. 2012), *aff'd*, 752 F.3d 460 (D.C. Cir. 2014) (citing *Army Times Publ'g Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1071 (D.C. Cir. 1993)); *see also Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977) ("An agency cannot meet its statutory burden of justification by conclusory allegations of possible harm. It must show by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA."); *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 259 (D.D.C. 2004) ("The deliberative process privilege exists to prevent injury to agency decisionmaking. . . . [s]uch harm can not be merely presumed . . ." (internal citation omitted)).

      Each of these areas must be addressed with reasonable specificity—a "broad and opaque description of the deliberative process involved does not provide the Court with enough detail about whether these documents are deliberative and predecisional." *Trea Senior Citizens League v. U.S. Dep't of State*, 923 F. Supp. 2d 55, 68 (D.D.C. 2013). Courts in this jurisdiction have

rejected agency descriptions that did not adequately describe the deliberative process at issue. *See, e.g.*, *Nat'l Sec. Counselors*, 960 F. Supp. 2d at 189 (rejecting a description of the deliberative process as "the process by which the [CIA] comes to a final determination in response to FOIA requests" (alteration in original)); *Trea Senior Citizens League*, 923 F. Supp. 2d at 68 (rejecting a description of the deliberative process as "the overall process of negotiating and signing the [totalization] agreement" (alteration in original)); *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d at 264 (rejecting a description of the deliberative process as "actions taken or proposed in response to the discovery of anthrax in the mail"). With these principles in mind, the Court turns to each agency's description of its application of the deliberative process privilege.

i.  EPA

Hunton argues that the EPA's *Vaughn* index is insufficient to justify its withholding of information pursuant to the deliberative process privilege. *E.g.*, Pl.'s Mot. Order EPA at 18–22, ECF No. 50. Because EPA does not sufficiently describe the particular decisionmaking process or the function of the records in that process, the Court agrees.

The EPA's *Vaughn* index begins with the following description for DOC-001:

> Reflect[ing] pre decisional deliberations . . . regarding jurisdiction over and development of the Cargill Salt Ponds. . . . At the time of this discussion, the Agency had not acted, and EPA was still deliberating on the best Agency-wide approach for coordinating its response. The author does not have decision-making authority with respect to providing the final response to said conditions. The withheld information is deliberative because EPA employees and managers were still internally discussing issues concerning responsive records and how to best coordinate the Agency's response, and were providing advice to the decision makers. The record reflects analysis, recommendations, and opinions that were considered as part of the Agency's decision making process prior to its actions regarding the Salt Ponds. The email does not constitute a final Agency action. Release would discourage open and frank discussions among its staff about the Agency's ongoing review of issues related to its response. Release would also have a chilling effect on agency decision-making processes, and on the Agency's

> ability to have internal discussions and consultations concerning its response. Furthermore, release would cause public confusion by disclosing rationales and reasons that were not in fact ultimately the grounds for EPA's ultimate response. The withheld information was not circulated outside the Agency. . . . The agency has released all reasonably segregable information. The remaining withheld information does not contain reasonably segregable factual information. To the extent any of the withheld information contains facts, is [sic] inextricably intertwined with the deliberative discussions concerning the Agency's ongoing development of its policies.

EPA's *Vaughn* index at 1, ECF No. 40-4. An attentive reader would detect only modest variation from this initial theme as the EPA's *Vaughn* index continues for several hundred pages. The precise quotation above is also found in the descriptions for, *inter alia*, DOC-002, DOC-003, DOC-079, DOC-156, DOC-225, DOC-279, and DOC-321.[23] *See, e.g.*, EPA's *Vaughn* index at 1–2, 2–3, 66–67, 134, 192, 243–44, 285–86.

This language[24]—in its various iterations—does not provide sufficient information about the nature of the specific deliberative process involved. Returning to the example of DOC-001, it

---

[23] Some entries included additional details at the location of the first ellipsis. *See, e.g.*, EPA's *Vaughn* index at 192 (describing DOC-225 as "reflect[ing] the pre decisional deliberations *of an EPA Deputy Regional Administrator about USACE's determinations* regarding jurisdiction over and development of the Cargill Salt Ponds and possible EPA action . . . ." (emphasis added to identify EPA's added material)). At the location of the final ellipsis, some entries listed additional claimed exemptions.

[24] Although the EPA argues that its *Vaughn* index must be considered in conjunction with its declarations, doing so would not close the gap. The EPA's declaration states that withheld records fall into one of three categories: "1) drafts of formal or official correspondence . . . ; 2) informal intra-or inter-agency emails reflecting deliberative discussions; and 3) other deliberative documents." Brush Decl. ¶ 27, ECF No. 40-2. The declaration further specifies that most of the drafts from EPA's first category relate to "1) Region 9's Special Case Request Memo; 2) Region 9's Office of Public Affairs 'Redwood City Special Case Talking Points' Memo; 3) Region 9 ORC's Redwood City Special Case ('Cargill 02-06-2015'); 4) Draft Cargill Fact Sheet developed for EPA Office of Congressional and Intergovernmental Relations and 5) EPA Headquarters Response Memo." Brush Decl. ¶ 28. Similarly, most of the informal communications from EPA's second category relate to "(1) the development of the substantive Agency decisions regarding the special case request, and (2) the drafting and development of the formal correspondence announcing or communicating those decisions." Brush Decl. ¶ 30. The records in EPA's third category are not further described except that they "regard[] the jurisdictional issues being considered by the EPA." Brush Decl. ¶ 33. These descriptions come

is unclear if the EPA considers the deliberative process to be "jurisdiction over and development of the Cargill Salt Ponds," or "the best Agency-wide approach for coordinating its response," or "issues concerning responsive records and how to best coordinate the Agency's response." EPA's *Vaughn* index at 1 (DOC-001). None of these options provides sufficient insight into a particular deliberative process, and the *Vaughn* index thus fails to demonstrate that DOC-001 was "generated as part of a definable decision-making process." *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135-36 (D.D.C. 2011) (citing *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)).

Mindful of the heightened requirement for specificity in the context of the deliberative process privilege, the Court cannot grant the EPA summary judgment because the EPA's disclosures, like others rejected in this jurisdiction, are insufficiently specific about the deliberative process at issue and the function and significance of each record in that process.[25]

### ii.  The Corps

Hunton also argues that the Corps' *Vaughn* index provides insufficient detail to justify the Corps' withholding of information under the deliberative process privilege, and the Court agrees.

_____

closer to describing the specific deliberative processes at issue, but the categories are not matched to specific records. Without connecting each record to a particularized process, the Court cannot understand each "*individual* document and the role it plays in the administrative process." *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (emphasis added) (quoting *Coastal States*, 617 F.2d at 867).

[25] Hunton also challenges the EPA's *Vaughn* index on the grounds that it contains "little more than boilerplate responses." Pl.'s Mot. Order EPA at 19–20. Although the Court rejects the EPA's request for summary judgment for other reasons, the Court notes that repetition between entries in a *Vaughn* index may be appropriate when multiple entries concern the same or similar deliberative processes. *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 147 (D.C. Cir. 2006). If multiple records truly served the same or highly similar roles in one deliberative process, it would be inefficient to force the agency to craft a verbally distinct description of each. The descriptions provided here, however, suffered from a problem of vagueness, not just repetition.

Many of the entries in the Corps' *Vaughn* index for records withheld under the deliberative process privilege are sparse, and do not describe either the specific deliberative process, the function of the particular record, or the nature of the decisionmaking authority. The entries in the Corps' *Vaughn* index are varied and defy easy summation, but many share the common feature of providing very little information—if any—about the decisional process supposedly at issue. For example, the entry for document 13710–13712 reads: "Discussion between HQUSACE regulatory and Chief Counsel regarding timing of possible meeting EPA [sic]." Corps' *Vaughn* index[26] at 133, ECF No. 52-4. Although this entry mentions a meeting, it does not describe the deliberative process of which that meeting was a part. The description also omits the *role* of this particular document, the nature of the decisionmaking authority vested in the participants, or any potential harm to the deliberative process that would be incurred by releasing the document. Many of the other entries in the Corps' *Vaughn* index are similarly nonspecific. *See, e.g.*, Corps' *Vaughn* index at 46 ("Email discussion between senior leadership contining [sic] opinions and recommendations related to agency participation in a site visit of RWC.") (entry for document 3094–3100); Corps' *Vaughn* index at 74 ("Email concerning briefing attendees – contains opinions.") (entry for document 736–737).

As these examples demonstrate, the Corps' *Vaughn* index[27] does not establish that the records at issue are part of a predecisional deliberative process. Because the Corps has "'failed to supply' in its *Vaughn* submissions 'the minimal information necessary to make a determination'

---

[26] Citations to the Corps' *Vaughn* index use ECF page numbers.

[27] Nor do the Corps' declarations provide the information missing from its *Vaughn* index. Those declarations clarify only that withheld documents pertain to both "the development of substantive agency decisions [and] . . . the jurisdictional determination." *See* Corps Reply at 10 (alteration in original) (quoting Bartlett Decl. ¶ 30, ECF No. 52-2). Both of these categories of decisions are broad and fail to illuminate the particular decisionmaking process at issue.

concerning applicability of the deliberative process privilege,"[28] the Court must deny the Corps'

request for summary judgment as to the propriety of its withholdings. *Elec. Frontier Found. v.*

*U.S. Dep't of Justice*, 826 F. Supp. 2d 157, 173 (D.D.C. 2011) (quoting *Coastal States*, 617 F.2d

at 861).

### iii.  The Army

Finally, Hunton argues that the Army's *Vaughn* index is insufficient to demonstrate

that the Army correctly withheld information under the deliberative process privilege, and the

Court agrees.

Although the Army's *Vaughn* index contains some variation, many of its entries do not

adequately describe why the deliberative process privilege was applied to certain records. For

example, the entire entry for document 334 reads: "Email contains pre-decisional information

related to legal advice between attorney and client regarding AJD legal and policy review"—in a

similar vein, the entry for 213 reads "Emails contain pre-decisional information for agency

official regarding information for AJD legal and policy review." Army's *Vaughn* index at 35, 48,

ECF No. 36-3. These descriptions are just as broad and vague as those previously rejected by

courts in this jurisdiction. They provide only the fuzziest description of the deliberative process,

and also omit entirely to describe the "function or significance" of the particular record or the

decisionmaking authority vested in the author. Nor does the Army address the possible harms

that could result from releasing the withheld information, except to argue in general that

"[r]elease of this information would impair the deliberative process." DeAgostino Decl. ¶ 21,

---

[28] The Court especially notes the absence of any comment by the Corps on the decisionmaking authority of the author for the many letters in the index written by the ASA(CW), who "has oversight responsibility over the USACE." DeAgostino Decl. ¶ 21, ECF No. 36-2.

ECF No. 36-2. The Army must, at least, describe the decisional process which would be harmed by disclosure and the nature of the harm.

Because the Army's disclosures do not provide "'the minimal information necessary to make a determination' concerning applicability of the deliberative process privilege" the Court denies the Army's request for summary judgment as to the propriety of its withholdings.[29] *See Elec. Frontier Found.*, 826 F. Supp. 2d at 173 (quoting *Coastal States*, 617 F.2d at 861).

*     *     *

The Court has thus determined that none of the three agencies has provided "'the minimal information necessary to make a determination' concerning applicability of the deliberative process privilege" and the Court will thus deny the agencies summary judgment as to the deliberative process privilege. *See Elec. Frontier Found.*, 826 F. Supp. 2d at 173 (quoting *Coastal States*, 617 F.2d at 861). The Court has several options for an appropriate remedy. "If the agency fails to provide a sufficiently detailed explanation to enable the district court to make a de novo determination of the agency's claims of exemption, the district court then has several options, including inspecting the documents *in camera*, requesting further affidavits, or allowing the plaintiff discovery." *Spirko v. USPS*, 147 F.3d 992, 997 (D.C. Cir. 1998); *see also Dickstein Shapiro LLP v. Dep't of Def.*, 730 F. Supp. 2d 6, 9 (D.D.C. 2010) ("Title 5, United States Code, Section 552, provides that the court 'may examine the contents of such agency records *in camera* to determine whether such records or any part thereof shall be withheld under any of the exemptions.'").

---

[29] Although the Army defends its use of a combined *Vaughn* index and declarations at length, *see* Army Reply at 14, ECF No. 51, the Army's difficulties arise not from its use of the combined approach, but from the lack of information provided in either the *Vaughn* index or its declarations.

In this case, as described with more specificity in the accompanying Order, the Court will entertain supplemental briefing and order *in camera* review of representative documents. *See Pinson v. U.S. Dep't of Justice*, 177 F. Supp. 3d 56, 90 (D.D.C. 2016) ("*In camera* inspection may be appropriate . . . when agency affidavits are insufficiently detailed to permit meaningful review of exemption claims . . . ." (quoting *Lam Lek Chong v. U.S. Drug Enf't Admin.*, 929 F.2d 729, 735 (D.C. Cir. 1991))). Ordering such review is at the discretion of the district court. *Dickstein Shapiro*, 730 F. Supp. 2d at 9.

However, in order to assist the parties moving forward, the Court will briefly address the specific issues concerning the application of the deliberative process privilege to withhold particular categories of documents. As a preliminary matter, the Court notes that both parties create unnecessary confusion by treating the entire chain of events here as one long decisionmaking process. That is not the case. The Court identifies at least three separate decisionmaking processes, namely: (1) the Corps' development of the "final" draft AJD; (2) the EPA's decision to exercise its special case authority; and (3) the Army's legal and policy review. In the future, both parties' briefing would be clarified by considering separately each decisionmaking process.

### iv.  The Corps' "Final" Draft AJD

The first bone of contention is the "final" draft AJD developed by the Corps and withheld under the deliberative process privilege by the EPA. *See, e.g.*, Compl., Ex. N (Hunton's FOIA request for the "final" draft AJD), ECF No. 1-14; Pl.'s Mot. Order EPA at 22–24, ECF No. 50.[30] Hunton argues that the "final" draft AJD was in an extremely advanced state because the subject

---

[30] This document was apparently prepared by the Corps no later than March 18, 2015, when Major General Peabody—the Deputy Commanding General for Civil and Emergency Operations of the Corps—emailed it to the EPA. *See, e.g.*, Pl.'s Mot. Order EPA at 22.

of Major General Peabody's email was "Redwood City Decision Finalized" and the body of the

email stated that Major General Peabody would "finalize and sign" the document the next day.

Ex. F, ECF No. 49-6. The EPA does not dispute that the "final" draft AJD was a whisker's

breadth from completion. Nonetheless, because the "final" draft AJD was never finalized and has

not—to this Court's knowledge—been adopted by any agency, the Court agrees with EPA that

the deliberative process privilege could apply.

First, the "final" draft AJD may be predecisional because it was created before the final

decision was reached on the AJD.[31] Hunton disputes this point on the ground that the document

was otherwise ready and the failure to actually issue the AJD was merely "ministerial."[32] Pl.'s

Mot. Order EPA at 23. However, the "draft" AJD does not appear to have been given any effect,

either informally or formally. It was never signed or finalized as referred to in the text of the

email. Nor does Hunton claim that the draft has been applied to govern CWA jurisdiction over

the site. Indeed, Hunton's repeated assertions that EPA has delayed and continues to delay the

CWA portion of the AJD makes it clear that the government is not giving the "final" draft AJD,

which Hunton asserts concluded against CWA jurisdiction, any legal effect.[33] *E.g.*, Compl.

¶¶ 13, 25.

---

[31] In fact, as far as the Court is aware, the AJD for the CWA is still pending. *See* EPA Reply at 18, ECF No. 57 (noting that the AJD had yet to issue as of August 17, 2016).

[32] Hunton also hints at a constitutional argument concerning the propriety of the CWA. *See* Pl.'s Reply Corps at 5, ECF No. 60. No such claim appears in the complaint, and therefore would not be properly before this Court.

[33] Although Hunton cites the Supreme Court's decision in *U.S. Army Corps of Engineers v. Hawkes* for the proposition that "the Corps' AJDs are 'final agency actions'" for APA purposes, Pl.'s Reply Corps at 5 (quoting 136 S. Ct. 1807, 1812 (2016)), this argument is inapposite here for several reasons, including that the "final" draft AJD was never issued by the Corps.

To argue that the "final" draft AJD is *not* predecisional, Hunton argues that it represents *the Corps'* final position, regardless of the EPA's decision to take over the determination. Pl.'s Mot. Order EPA at 23 (asserting that "the Corps had reached its final agency position" and "[t]he fact that EPA chose to make a decision on its own . . . does not convert the Corps' decision into a pre-decisional deliberative document"). This argument confuses the temporal sense of "final" with the sense required by FOIA. Hunton presents no evidence that the Corps, or any other agency, has ever relied on, referred to, or treated as precedential the "final" draft AJD. As in other circumstances where agencies have ceased to work in an area, that cessation does not convert the Corps' last-in-time position to a legally final one:

> the [deliberative process] privilege does not turn on the agency's present ability to engage in the type of rulemaking to which the deliberations in question were relevant. Agency employees most certainly would be inhibited from frank deliberation if their statements could be made public instantaneously upon the agency's happenstance loss of jurisdiction over the subject matter of their deliberations . . . . [*T*]*he fact that a memorandum concerns an enforcement action that was never taken does not compel its disclosure.*

*Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 699–700 (D.D.C. 1983) (emphasis added); *see also Ashley v. U.S. Dep't of Labor*, 589 F. Supp. 901, 908 (D.D.C. 1983) ("Similarly, an agency's rejection of the recommendations in a withheld document, either explicitly or implicitly through agency inaction, does not make otherwise predecisional documents final and disclosable." (citing *Common Cause v. IRS*, 646 F.2d 656, 659 (D.C. Cir. 1981), *Brinton v. Dep't of State*, 636 F.2d 600, 600 (D.C. Cir. 1980), and *Lead Industries Ass'n., Inc. v. OSHA*, 610 F.2d 70, 84 (2d Cir. 1979))).

Second, the "final" draft may be deliberative because it represents the back and forth of the decisionmaking process. This is ultimately a functional analysis—a document is "part of the deliberative process if its disclosure would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's

ability to perform its functions." *Judicial Watch of Florida, Inc. v. U.S. Dep't of Justice*, 102 F.
Supp. 2d 6, 13 (D.D.C. 2000) (citing *Formaldehyde Inst. v. Dep't of Health and Human Servs.*,
889 F.2d 1118, 1122 (D.C. Cir. 1989) and *Mobil Oil Corp. v. EPA*, 879 F.2d 698, 703 (9th Cir.
1989)). The deliberative process can—as it did here—span between two different agencies. This
set-up is particularly common when one agency serves a secondary function to a supervising
agency. *See Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 187–88 (1975)
("By including inter-agency memoranda in Exemption 5, Congress plainly intended to permit
one agency possessing decisional authority to obtain written recommendations and advice from a
separate agency not possessing such decisional authority without requiring that the advice be any
more disclosable than similar advice received from within the agency.").

 For example, another court in this jurisdiction considered the applicability of the
deliberative process exemption to documents transmitted between the Office of Government
Ethics (OGE) and the Department of the Interior (DOI). The OGE "relies upon agencies to
conduct inquiries into ethics violations and to report their findings" because of its "limited
resources," but, "the results of the agency's investigations and [the agency's] own conclusions
about whether ethics violations actually occurred are not the final word if the OGE finds that
more needs to be done." *Defs. of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 19 (D.D.C.
2004). That court therefore concluded that the DOI's letters to OGE discussing DOI's inquiry
into an ethics violation were protected by the deliberative process privilege—they "did not
constitute final decisions just waiting to be implemented" because "the OGE had the authority to
disagree with the conclusions contained therein, and it did so. . . . OGE, in effect, overrode
DOI's initial conclusions." *Id.* at 20–21.

This case fits the same pattern. Here, the EPA has the ultimate authority to decide questions of CWA jurisdiction. The agreement between the Corps and the EPA describing the special case authority begins from this premise. *See* Mem. Agreement at 1, ECF No. 57-1 ("The Attorney General of the United States issued an opinion . . . that the Administrator of EPA . . . has the ultimate authority under the CWA to determine the geographic jurisdictional scope of section 404 waters of the United States and the application of section 404(f) exemptions."); Mem. Agreement at 2 ("EPA will be considered the lead agency and will make the final decision if the agencies disagree."); Mem. Agreement at 2 ("A special case is a circumstance where EPA makes the final determination of the geographic jurisdictional scope of the waters of the United States for the purposes of section 404."). The Corps' submissions[34] to the EPA thus are part of the deliberative process because the EPA retained the authority to disagree and exercise its special case power—as it did here. Given that neither the Corps nor the EPA has—to the best of this Court's knowledge—issued a final decision, the deliberative process is ongoing.[35] Just as in

---

[34] The material provided to the supervising agency need not take the form of a recommendation, it can also—as the "final" draft AJD presumably did here—contain legal opinions. *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975) ("[T]he document must be a direct part of the deliberative process in that it makes recommendations *or expresses opinions on legal or policy matters*." (emphasis added)).

[35] The extent to which the EPA relies upon or eventually adopts the "final" draft AJD as a recommendation is immaterial. Even if the EPA disregards the Corps' opinion, then the Corps' decisionmaking process has stopped without a final decision, yet the material may still be withheld as discussed above.

If the EPA does adopt part of the Corps' reasoning, then the extent of that adoption will control whether the EPA must disclose the "final" draft AJD as part of that final decision. *See Trans Union LLC v. Fed. Trade Comm'n*, 141 F. Supp. 2d 62, 70–71 (D.D.C. 2001) ("[W]here it is unclear whether a recommendation provided the basis for the regulation, the recommendation is exempt from disclosure."); *De Sousa v. CIA*, No. 14-1951, 2017 WL 943898, at *13 (D.D.C. Mar. 9, 2017) ("[A]doption requires that an agency 'make an "express[ ]" choice to use a deliberative document as a source of agency guidance.'" (quoting *Sears, Roebuck & Co.*, 421 U.S. at 161)). The Court need not decide this at this time, as it does not appear that the EPA has issued a final decision.

*Defenders of Wildlife*, revealing the Corps' reasoning could damage the open dialogue between the two collaborating agencies, and risk "confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action" once the EPA reaches a final decision. EPA Reply at 18, ECF No. 57 (quoting *Coastal States*, 617 F.2d at 866); *see also Defs. of Wildlife*, 314 F. Supp. 2d at 21 ("[D]isclosure of the documents exchanged between DOI and OGE would expose the decision-making process OGE initiated and directed in such a way as to discourage candid communication in the future between OGE and agencies.").

For these reasons, the Court finds it highly plausible that the "final" draft AJD created by the Corps is exempt from disclosure.[36] However, the infirmities of the EPA's *Vaughn* index, as

---

[36] Nor does Hunton's argument that the "final" draft AJD constitutes "secret law" dictate a different outcome. Under the "secret law" doctrine, a record which has not officially become a final decision, but is treated with the same de facto respect as a final decision, is not protected by the deliberative process privilege. The "secret law" doctrine thus permits the public to discover "the reasons which did supply the basis for an agency policy *actually adopted*." Pl.'s Mot. Order EPA at 13–14, ECF No. 50 (quoting *Sears, Roebuck & Co.*, 421 U.S. at 152–53) (emphasis added); *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980) ("[A]n agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'").

The classic secret law cases deal with "orders and interpretations which [the agency] actually applies in cases before it," *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971), or which are "routinely used by agency staff as guidance," *Coastal States*, 617 F.2d at 869. For example, the documents at issue in *Coastal States* were "regional counsel opinions" that "were routinely used by agency staff as guidance in conducting their audits, and were retained and referred to as precedent." *Coastal States*, 617 F.2d at 869. Here, however, Hunton does not argue that the Corps has been using the "final" draft AJD in any way or explain how the "final" draft AJD "reflect[s] the law the government is actually applying in its dealings with the [] public." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997). Such manuals or policy guidance are also typically sent down the chain of command, distributed from the top down to those responsible for implementing a policy. Here, the "final" draft AJD was sent from the top of the Corps to the EPA, in the EPA's supervisory capacity. Hunton does not argue that the "final" draft AJD has been distributed downward to those who implement the Corps' policies.

To the extent that the Corps' argument is simply that the "final" draft AJD represents one stage of the Corps' reasoning, this argument proves too much. Allowing the public access to all

discussed above, prevent the Court from granting the EPA summary judgment. Instead, the EPA must explain "such matters as how decisions like those in issue are reached; the role that staff discussion and memoranda play in such decisions; the manner in which such decisions are memorialized and explained; and whether such decisions are treated, in later agency decisionmaking, as precedents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1204 (D.C. Cir. 1991) (citing *Renegotiation Bd.*, 421 U.S. at 185–86).

v.  The EPA's Decision to Exercise Its Special Case Authority

Second, Hunton challenges the EPA's withholding of records related to its decision to use its special case authority.[37] In its *in camera* review the Court will focus on whether the withheld materials are both predecisional and deliberative, as required by the deliberative process privilege, as well as whether they constitute "secret law" such that they are removed from the protections of the deliberative process privilege. The Court also notes that "FOIA is not designed to force every government agency to produce a document explaining each of its decisions, nor is it designed to force the agency or courts to find and disclose whatever extant document comes closest to serving that decision-explaining role." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 575 F.2d 932, 936 (D.C. Cir. 1978) (citing *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 192 (1975)).

Hunton and the EPA dispute whether or not the documents are predecisional. According to the EPA, they are because it did not exercise the special case authority until March of 2015.

stages of agency decisionmaking would no doubt reveal something about the agencies' reasoning, but Congress has determined that such unfettered disclosure would be damaging to the agencies' ability to deliberate.

[37] Hunton suggests these would be documents generated by EPA after April 2014, Pl.'s Mot. Order EPA at 16, ECF No. 50, but before EPA exercised the special case authority in March of 2015, EPA MSJ, Ex. E, ECF No. 40-3.

According to Hunton, the decision had actually been made prior to that, as evidenced by a dramatic reduction in the number of documents. Pl.'s Mot. Order EPA at 16–17. Even if the documents were predecisional, the parties also dispute whether some of the withheld documents constitute the "working law" of the agency that must be disclosed. To make this determination, a court considers "the function and significance of the document in the agency's decisionmaking process." *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 678 (D.C. Cir. 1981). Both of these questions will be more easily explored after this Court's *in camera* review, and the Court thus defers their resolution.

### vi.  The Army's Legal and Policy Review

Hunton also seeks documents from the Army relating to its legal and policy review.[38] Pl.'s MPSJ Army at 17, ECF No. 46 ("[A] considerable number of the redacted or withheld documents relate to the content of the so-called 'legal and policy review.' . . . . Plaintiff is entitled to know the reasons which supplied the basis for the adopted policy." (internal quotation marks and citations omitted)). The legal and policy review began in May of 2014, Compl. Army

---

[38] It is unclear if Hunton also seeks documents created by the Army relating to its *decision to undertake* the legal and policy review. *See* Pl.'s MPSJ Army at 17, ECF No. 46 ("Given that the Army ultimately decided to conduct this '[legal and policy] review,' Plaintiff is entitled to know the reasons which supplied the basis' for the adopted policy." (citing *Elec. Frontier Found.*, 739 F.3d at 7)). The Court is unaware of any documents listed in the Army's *Vaughn* index—and Hunton does not identify any—from before the date Hunton names as the beginning of the legal and policy review of "[o]n or around May 15, 2014." Compl. Army at ¶ 21, ECF No. 1 (No. 15-cv-1208). Nor does Hunton argue explicitly that the Army's search was inadequate on that basis. To the extent that there are withheld documents relating to the Army's decision to embark on the legal and policy review and Hunton seeks those documents, the Court will consider the applicability of FOIA exemptions to such documents as part of its *in camera* review.

Similarly, it is unclear if Hunton seeks records related to the *Corps'* internal review, which was undertaken at nearly the same time. *See* Mem. for the Chief of Engineers at 2, Ex. 2, ECF No. 45-2. To the extent that Hunton does, the Court is also open to considering these documents during its *in camera* review.

¶ 21, ECF No. 1 (No. 15-cv-1208), and the Court thus assumes that Hunton refers to documents from after that date.

The parties' briefing of this issue reflects confusion among the several separate decisionmaking processes. *See, e.g.*, Pl.'s MPSJ Corps at 10, ECF No. 56 (arguing that the legal and policy review was not predecisional because it "did not affect the decision that the Corps initially made in 2014," presumably, the Corps' "final" draft AJD). For example, Hunton argues that it should be entitled to documents relating to the legal and policy review because the "relevant decision" was the Army's choice to "undertake the vague 'legal and policy review'" which was complete when the review began. Pl.'s Reply Army at 5–6, ECF No. 54. While this may be an accurate statement, the documents generated during the legal and policy review should be analyzed in relation to the decisionmaking process of that review—culminating in the completion of the review —not in the context of the earlier, separate decision to perform the review.

Before it can consider whether the documents were predecisional or deliberative, the Court must determine whether the legal and policy review was a deliberative process at all. In some situations, an agency's reexamination of its own behavior does constitute a deliberative process. *See Sears*, 421 U.S. at 151 n.18 ("Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process."); *Ashley v. U.S. Dep't of Labor*, 589 F. Supp. 901, 908 (D.D.C. 1983) ("[D]iscussion of the merits of past efforts, alternatives currently available, and recommendations as to future strategy are privileged if the documents bear sufficient indicia that they were part of the deliberative process . . . . [including that] they were all written by subordinates to superiors, the authors had no decisionmaking authority, and the opinions

expressed therein did not explain agency policy or establish agency guidelines or secret law[.]"
(internal quotation marks and citations omitted)). If the Court concludes that these criteria are
met, it must then determine whether each document is predecisional and deliberative, and if any
constitute the Army's "secret law." The Court will be better positioned to address each of these
questions after its *in camera* review and upon reviewing the Army's supplemental briefing.

### 2. The Attorney Work-Product Privilege

Hunton challenges the Corps' use of Exemption 5 to withhold information on the basis of
the attorney work-product privilege. Because the Corps has not adequately shown that the
records in question were prepared "because of" potential litigation, the Court denies the Corps
summary judgment.

One category of records exempted from disclosure by Exemption 5 of FOIA is attorney
work-product. The work-product privilege "shields materials 'prepared in anticipation of
litigation or for trial by or for another party or by or for that other party's representative.'"
*Judicial Watch, Inc. v. Dep't of Justice*, 432 F.3d 366, 369 (D.C. Cir. 2005) (quoting Fed. R. Civ.
P. 26(b)(3) and *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997)). The privilege protects
"the mental impressions, conclusions, opinions, or legal theories of an attorney," as well as
"factual materials prepared in anticipation of litigation." *Tax Analysts*, 117 F.3d at 620 (internal
quotation marks omitted). The work-product privilege originates from the longstanding
recognition that "materials prepared by one's attorney in anticipation of litigation are generally
privileged from discovery by one's adversary." *Nat'l Ass'n of Criminal Def. Lawyers v. U. S.
Dep't of Justice Exec. Office for U.S. Attorneys*, 844 F.3d 246, 250 (D.C. Cir. 2016) (citing
*Hickman v. Taylor*, 329 U.S. 495, 510–12 (1947) and *In re Sealed Case*, 146 F.3d 881, 884 (D.C.
Cir. 1998)).

In order to establish that it has properly withheld information under the work-product privilege, the agency must: "(1) provide a description of the nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable." *Ellis v. U.S. Dep't of Justice*, 110 F. Supp. 3d 99, 108 (D.D.C. 2015), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016); *see also FTC v. Boehringer Ingelheim Pharms. Inc.*, 778 F.3d 142, 149 (D.C. Cir. 2015) (holding that records qualify for protection under the attorney work-product privilege when "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation" (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010))); *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998) (requiring the agency to demonstrate that the records were created with a "subjective belief that litigation was a real possibility, and that belief must have been objectively reasonable").

The Corps' descriptions of information withheld in the Corps' *Vaughn* index are insufficient to establish that the withheld documents were prepared because of potential litigation. Two groups of documents illustrate the point.

First, the Corps justified its withholding of draft versions of the AJD by applying the work-product privilege. *See, e.g.*, Corps' *Vaughn* index at 115–22, ECF No. 52-4 (entries for 9994–9998, 10022–10029, 10045–10052, 10154–10162, 11305–11312 including descriptions such as "Draft, nonfinal JD under the Rivers and Harbors Act and Clean Water Act"). Second, the Corps used the privilege to withhold draft versions of letters to members of Congress. *See,*

*e.g.*, Corps' *Vaughn* index at 123–26 (entries for 11871–11873, 11965–11966, 12086–12087 including descriptions such as "Draft letter to member of Congress regarding status of Cargill JD").

The work-product privilege does not cover "any document prepared by any person in the Government with a law degree simply because litigation might someday occur" or else "the policies of the FOIA would be largely defeated." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980). The Court must apply a "'because of' test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (emphasis added) (quoting *In re Sealed Case*, 146 F.3d at 884).

The "because of" test demonstrates the flaw in the Corps' reasoning. Drafts of the AJD were not prepared *because of* possible litigation. The Corps was required to prepare the AJD, and thus drafts of the AJD, even if it knew that no litigation would ever result. Similarly, the Corps' replies to Congress about the AJD process were not created "because of" the possibility of future litigation—unless the Corps would have ignored Congressional inquiries into a less controversial case. The Corps does not attempt to explain how drafts of the AJD constitute attorney work-product. As to the draft letters, the Corps argues that because the parties seeking the AJD were "contentious" and "litigious[]," the Corps expected that its letters to Congress would "find [their] way into litigation." Corps Reply at 17, ECF No. 59. This misunderstands the nature of the privilege. The mere fact that a document might *find its way into litigation* does not suffice unless the litigation was the *reason* for the creation of the document. *See Coastal States*, 617 F.2d at 865.

Although the Corps has not yet established that these records were created because of reasonably expected litigation, such a showing remains possible in the future. For example, an

agency performing a statutory duty with a reasonable anticipation of litigation might have additional counsel edit the documents or draft plans for litigation strategy *because of* that reasonable expectation, and those edits or plans could then qualify for the attorney work-product privilege. However, the Corps has not provided sufficient explanation to conclude that similar circumstances existed here. The Corps' motion for summary judgment is thus denied as to its use of the work-product portion of Exemption 5.[39]

### 3. The Attorney–Client Privilege

Hunton challenges the Corps' and the Army's use of the attorney–client privilege portion of Exemption 5.[40] Although the Corps' *Vaughn* Index is inadequate to demonstrate that it justifiably withheld information based on the attorney–client privilege, the Army has adequately met its burden.

---

[39] The Corps also notes that much of the information withheld under the work-product privilege was also withheld under other portions of Exemptions 5 or other FOIA exemptions, but takes this position to the extreme in arguing that, because Hunton did not expressly object to every claimed exemption, "any challenge to the withholding of the documents should be deemed waived." Corps Reply at 16. This goes too far.

Although, of course, the agency may withhold material as long as it is proper under a *single* FOIA exemption, the agency should not treat a laundry list of FOIA exemptions as a trap for the unwary. At the summary judgment stage, the *agency* bears the burden of proving "that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements." *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (internal quotation marks omitted) (quoting *Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)). Furthermore, "FOIA litigants are entitled to assume that the agency's *Vaughn* index is accurate in every detail" and "[t]here is no excuse for submitting a *Vaughn* index that contains errors, even minor ones," *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992), *abrogated on other grounds*, *Milner v. Dep't of Navy*, 562 U.S. 562 (2011).

[40] Hunton also devotes one paragraph in each of its briefings to challenge the EPA's use of the attorney–client privilege. *See* Pl.'s Mot. Order EPA at 19, ECF No. 50. If the Court were to consider this argument, it would be satisfied by the EPA's *Vaughn* index. *See* EPA's *Vaughn* index at 77, ECF No. 40-4.

"The attorney–client privilege protects confidential communications from clients to their attorneys made for the purpose of securing legal advice or services. The privilege also protects communications from attorneys to their clients if the communications 'rest on confidential information obtained from the client.'" *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997) (quoting *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C. Cir. 1984)). "In the governmental context, the 'client' may be the agency and the attorney may be the agency lawyer." *Tax Analysts*, 117 F.3d at 618. The government bears the burden of proving, through "detailed and specific information," that the withheld information falls within the attorney–client privilege. *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). To succeed on a motion for summary judgment, the government must show:

> (1) [T]he holder of the privilege is, or sought to be, a client; (2) the person to whom the communication is made is a member of the bar or his subordinate and, in connection with the communication at issue, is acting in his or her capacity as a lawyer; (3) the communication relates to a fact of which the attorney was informed by his client, outside the presence of strangers, for the purpose of securing legal advice; and (4) the privilege has been claimed by the client.

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 153–54 (D.D.C. 2012) (citing *In re Sealed Case*, 737 F.2d at 98–99). With this standard in mind, the Court addresses each agency's withholdings.

### a. *The Corps' Use of the Attorney–Client Privilege*

Hunton argues that the Corps has failed to justify its application of the attorney–client privilege because it does not sufficiently describe the context of withheld information, and appears to apply the exemption to correspondence where the lawyer was merely carbon-copied, rather than an active participant. The Court agrees that the Corps' explanations are insufficient.

Hunton argues that the Corps applied the attorney–client privilege to justify withholding "communications between various non-attorney personnel where an attorney has been copied."

Pl.'s MPSJ Corps at 14, ECF No. 56. An example is illustrative. Consider an email colloquy between two non-attorney agency employees, sent to a lawyer as a carbon-copy.[41] Pl.'s MPSJ Corps, Ex. D, ECF No. 56-4. The Corps claims that both the deliberative process and attorney–client privileges apply. Corps' *Vaughn* index at 47, ECF. No. 52-4. The *Vaughn* index description reads, in relevant part: "[e]mail between USACE Leadership, Army OGC, and the ASA(CW) discussing the purpose and need for the policy and legal review of the Redwood City Salt plant JD process." Corps' *Vaughn* index, ECF. No. 52-4. This brief description does not sufficiently explain the application of the attorney–client privilege, given that the context makes it clear that the attorney was only a participant in the email chain as a carbon-copy.

Nor can the information missing from the Corps' *Vaughn* index be drawn from its declaration.[42] *Cf.* Corps Reply at 15, ECF No. 59. The Corps' declaration states only that, in general:

---

[41] Neither party provides a citation to the *Vaughn* index entry for this document in their discussion. The Court interprets the reference in the exhibit to Bates number 3139 to match it with the cited entry in the *Vaughn* entry on page 47.

Although the *Vaughn* index entry does not name the lawyer, the email addresses in the document itself are not redacted. One message was sent from Jo-Ellen Darcy—the ASA(CW)—to Thomas Bostick—the commanding general of USACE—with Craig Schmauder—a lawyer at the Army's OGC—as a carbon-copy. Pl.'s MPSJ Corps, Ex. D, ECF No. 56-4. The second email was sent back from Thomas Bostick to Jo-Ellen Darcy with Craig Schmauder again as a carbon-copy. Pl.'s MPSJ Corps, Ex. D, ECF No. 56-4. The Corps does not dispute Hunton's characterization of the roles of the three participants.

[42] Furthermore, the explanation provided in the Corps' briefing contradicts its initial explanation in its *Vaughn* index, further clouding the issue. The *Vaughn* index indicated the email was between "USACE Leadership, Army OGC, and the ASA(CW)." Corps' *Vaughn* index at 47, ECF. No. 52-4. This explanation fits well with the three participants in the address block of email: Thomas Bostick, the commanding general of the Corps, as "USACE Leadership;" Craig Schmauder, a lawyer for the Army, as the "Army OGC;" and Jo-Ellen Darcy in her role as the "ASA(CW)." But the Corps' briefing seeks to explain the application of the attorney–client privilege by claiming that the "the entire chain" of emails was sent to E. Stockdale, a lawyer with the Corps. 2d Bartlett Decl. ¶ 5, ECF No. 59-1. This recent explanation involves the participation of a person who does not fit comfortably into any of the categories mentioned in the Corps' *Vaughn* index explanation. *Cf. Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992) ("There

> Information that was withheld pursuant to the Attorney–Client Privilege
> contained confidential communications regarding legal consultation regarding the
> jurisdictional determination and other legal issues related to the Saltworks
> between the USACE and personnel and their attorneys, and between USACE,
> EPA, and Army attorneys. The subject of these confidential communications were
> not released or made known to third parties and therefore these communications
> are protected from disclosure.

Bartlett Decl. ¶ 32, ECF No. 52-2. However, these broad and vague statements, in conjunction

with a bare *Vaughn* index, are insufficient. The agency may not "offer[] nothing more than

conclusory assertions and blanket affirmations" to support its use of the attorney–client privilege.

*Cuban v. SEC*, 744 F. Supp. 2d 60, 79 (D.D.C. 2010). This general statement cannot overcome

the otherwise inadequate *Vaughn* index because it fails to provide necessary document-specific

information such as the identities of the client and lawyer and whether legal advice was sought.

*See Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 153–54 (D.D.C.

2012). Thus, because the Corps has not satisfactorily demonstrated the elements of the

attorney–client privilege, the Court denies it summary judgment on the basis of that privilege.[43]

---

is no excuse for submitting a *Vaughn* index that contains errors, even minor ones."), *abrogated on other grounds, Milner v. Dep't of Navy*, 562 U.S. 562 (2011).

[43] Hunton also objects to the Corps' use of the attorney–client privilege to withhold, rather than entire communications, "markings placed by an attorney." Pl.'s MPSJ Corps at 14, ECF No. 56. In general, the Court agrees with the Corps that markings may be "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." Corps Reply at 14, ECF No. 59 (quoting *Mead Data Cent. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977)).

However, it is not clear from the briefing if the affected records were withheld in their entirety or redacted, and the Court notes that redaction—where it will not render the privilege futile—is the typical remedy in this jurisdiction. *See, e.g., A.N.S.W.E.R. Coal. v. Salazar*, No. 05-0071, 2011 WL 2516419, at *2 (D.D.C. June 23, 2011); *Gen. Elec. Co. v. Johnson*, No. 00-2855, 2007 WL 433095, at *21 (D.D.C. Feb. 5, 2007) (concluding after an *in camera* review that handwritten comments by an attorney should be redacted, but "those redactions should leave in tact [sic] as much text as possible" because "except for the two annotated comments, the underlining and other markings are only very marginally protected by the work-product doctrine"). Because the Court denies the Corps summary judgment and will review a selection of documents *in camera*, it does not further address the issue here.

### b.  *The Army's Use of the Attorney–Client Privilege*

Unlike the Corps' *Vaughn* index, the Army's *Vaughn* index is adequate to justify its use

of the attorney–client privilege. Although Hunton advances three arguments challenging the

adequacy of the Army's *Vaughn* index, none is successful.

First, Hunton accuses the Army of "simply redact[ing] all communications between

attorneys" because "there is nothing in either the DeAgostino declaration or the *Vaughn* index to

support the conclusory assertion that these communications contain legal advice." Pl.'s MPSJ

Army at 19–20, ECF No. 46. However, the Army's *Vaughn* index does specify the nature of the

legal advice involved in each document. For example, Entry 423, which was partially withheld

based on the attorney–client privilege, states that the record contains a "[d]raft response . . .

prepared [] by attorney to advise client regarding responding to requester." Army's *Vaughn*

index at 57, ECF No. 36-3. While not a model of specificity, that description makes sense in the

context of the document and informs Hunton about the type of legal advice provided. This

description rises to the level of being "logical or plausible," which the D.C. Circuit has explained

suffices. *Wolf v. CIA*, 473 F.3d 370, 375 (D.C. Cir. 2007) (internal quotation marks and citations

omitted). Here, the Army has described "the documents and the justifications for nondisclosure

with reasonably specific detail" and "demonstrate[d] that the information withheld logically falls

within the claimed exemption." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of

Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (internal quotation marks and citations omitted). In

---

Finally, in response to Hunton's challenges to the Corps' assertion of the attorney–client
privilege the Corps again objects that Hunton has waived other possible objections by failing to
individually rebut each exemption claimed by the Corps. *See, e.g.*, Corps Reply at 14, ECF No.
59. This goes too far. *See supra* note 39.

the absence of "contrary evidence in the record []or [] evidence of agency bad faith" the Army's description is sufficient. *Id.* at 80 (internal quotation marks and citations omitted).

Second, Hunton claims that the Army did not sufficiently establish that the communications were kept confidential between the attorney and client. Pl.'s MPSJ Army at 18–19. But in fact the Army's supplemental declaration states that "[t]he documents withheld in accordance with the Attorney–Client Privilege were internal documents only and were not released to third parties." 2d DeAgostino Decl ¶ 3, ECF No. 51-1. Hunton does not challenge this declaration in its reply, nor has it identified any indicia on the redacted documents that they were distributed to outside entities. *See* Pl.'s Reply Army at 7–9, ECF No. 54.

Finally, Hunton criticizes the particular application of the attorney–client privilege to the record described at entry 104 of the Army's *Vaughn* index. Army's *Vaughn* index at 19, ECF 36-3. According to Hunton, the Army did not "differentiat[e] which privilege is supposed to apply to which document," within the email chain. Pl.'s MPSJ Army at 19. Contrary to Hunton's assertion, the Army's *Vaughn* index specifies that the chain contains "[t]wo emails between agency counsel," and that "[t]here are also two emails between Earl Stockdale [counsel for the Corps] and Craig Schmauder [counsel for the Army]." Army's *Vaughn* index at 19, entry 104. Hunton appears to object that the two lawyers involved are counsel for different agencies. Pl.'s MPSJ Army at 19. Contrary to Hunton's implication, courts in this district have recognized that the attorney–client privilege may apply between counsel for different agencies. *See Hollar v. IRS*, No. 95-1882, 1997 WL 732542, at *5 (D.D.C. 1997) ("Communications between one agency's attorneys and another agency's attorneys are also covered by both Exemption 5 and the attorney–client privilege as 'inter-agency' memoranda so long as those communications reflect the facts given by agency decision-makers to elicit legal advice." (citing *Schlefer v. United*

*States*, 701 F.2d 233, 245 (D.C. Cir. 1983))). For these reasons, the Army's motion for summary judgment as to its use of the attorney–client privilege is granted.

### 4. FOIA Exemption 6

Hunton challenges the Army's use of Exemption 6 to redact personal information from the released records.[44] Pl.'s MPSJ Army at 21–23, ECF No. 46. The Army used Exemption 6 to redact the "names and contact information of government personnel" below the level of either general officer or senior executive service. DeAgostino Decl. ¶ 23, ECF No. 36-2; 2d DeAgostino Decl. ¶ 4, ECF No. 51-1. These redactions included the identities of individuals who sent or received email. DeAgostino Decl. ¶ 23.

Exemption 6 permits an agency to withhold "personnel and medical files and similar files," when disclosure "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Here, neither party disputes that the names and contact information of the Army's employees constitute personal information. *See Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (holding that personal information includes "names and addresses"); *Milton v. U.S. Dep't of Justice*, 783 F.Supp.2d 55, 58 (D.D.C. 2011) (holding that "[t]he information . . . 'need not be intimate'" (quoting *N.Y. Times Co. v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990))).

FOIA requires the release of personal information "if no significant privacy interest is implicated." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008)

---

[44] Hunton also makes a brief reference alleging a misuse of Exemption 6 by the Corps. *See* Pl.'s MPSJ Corps at 1, ECF No. 56. Because this argument is not further developed, the Court agrees with the Corps that it has been waived. *See* Corps Reply at 9, ECF No. 59; *cf. Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013) ("[I]t is not the obligation of this Court to research and construct the legal arguments available to the parties. To the contrary, perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." (internal quotation marks and citations omitted)).

(brackets and internal quotation marks omitted) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)). This standard, however, "means less than it might seem," for a substantial privacy interest is "anything greater than a *de minimis* privacy interest." *Id.* at 1229–30. Here, the Army employees do clearly have a substantial privacy interest in avoiding potential harassment, and Hunton does not assert that they do not have a privacy interest.

The Court must thus determine whether releasing the information would be a "clearly unwarranted invasion of personal privacy," *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 260 (D.C. Cir. 1982) (internal quotation marks omitted) (quoting 5 U.S.C. § 552(b)(6)), by balancing "the privacy interest that would be compromised by disclosure against any public interest in the requested information," *Multi Ag Media*, 515 F.3d at 1228. "The only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would 'shed light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (brackets and internal quotation marks omitted) (quoting *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994)).

First, the Court finds that, as to their contact information, the privacy interest of the Army employees outweighs the public interest in disclosure. Hunton does not identify any public interest in this information. *See Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1056 (D.C. Cir. 2009) ("We have been shown no public interest in . . . disclosure. . . . We need not linger over the balance; something, even a modest privacy interest, outweighs nothing every time." (quoting *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989))).

Next, the Court turns to the withholding of the *names* of Army employees. On the
privacy side of the balancing equation, government employees have a privacy interest in keeping
their names from the public spotlight. The Army notes that its employees could "become targets
of harassing inquiries for unauthorized access to information if their identities are released"
because they have access to sensitive information. DeAgostino Decl. ¶ 24. Further, the Army is
concerned about "hazards . . . evidenced by the recent attacks on service members and
installations in recent years."[45] 2d DeAgostino Decl. ¶ 4, ECF No. 51-1.

On the public interest side, Hunton claims a "substantial public interest in knowing the
identities and job functions of the individuals involved in this case" because "a critical
component of understanding what took place is understanding who was involved in the decision-
making process." Pl.'s Opp'n to Army at 21, 23, ECF No. 45. Hunton asserts that "the Army
policy of redacting the identities of the majority of its personnel makes it often impossible to determine
from the face of the document the relative positions of the author and recipient." Pl.'s MPSJ
Army at 16 n.4. Although the Army counters that non-senior personnel are "identified by title or
position" "throughout the *Vaughn* index," Army Reply at 19, ECF No. 51, inspection of the
*Vaughn* index reveals that the involved individuals are frequently described only as "non-Senior
Executive personnel," *see, e.g.*, Army *Vaughn* index at 2 (entry for document 13 reading

---

[45] The Army buttresses these arguments by reference to a Department of Defense policy
that calls for withholding the names of low-ranking employees. *See, e.g.*, Army Reply at 19
(citing to memoranda filed as exhibits at ECF No. 51-1). However—as Hunton notes—that
policy on its face appears to cover aggregated lists of employees, rather than employees' names
incidentally included in other documents. *See* Memorandum for DOD FOIA Offices (Nov. 9,
2001) ("Ordinarily names of DoD personnel, other than lists of names, mentioned in documents
that are releasable under the FOIA should not be withheld, but in special circumstances where
the release of a particular name would raise substantial security or privacy concerns, such a name
may be withheld."), ECF No. 51-1. The Court thus does not find the Department of Defense
policy highly persuasive as to the privacy interest.

"[e]mail[] between non-Senior Executive personnel and Craig Schmauder"); Army *Vaughn*

index at 10 (entry for document 50 reading "[e]mail string: between non-Senior Executive

personnel and Senior Executive personnel").

In balancing these interests, the Court finds that the public interest in understanding what

the government is up to outweighs the interest of the Army employees in privacy as to the names

of the involved employees. Although there is a privacy interest, it is likely small. The Army has

already named several individuals in its briefing as custodians, reducing their remaining privacy

interest in the remaining documents. *See, e.g.*, DeAgostino Decl. ¶ 12 (naming nine custodians).

Furthermore, the Army does not give any reason to believe that individuals involved in this AJD

determination face particular risks such as harassment. Hunton has identified a public interest in

understanding the agency's functioning that will be served by identifying the employees

involved and permitting observers to understand the progress of the various released documents.

Nor do the cases cited by the Army, in which other courts permit it to withhold names,

control the outcome of this case. In each cited case the court considered the balancing test of

Exemption 6 and found that the privacy interests outweighed the public interest articulated by the

requester, often because the requesters did not articulate a public interest in the employees'

names.[46] Here, Hunton *does* articulate that the public's interest in understanding the

---

[46] *See, e.g.*, *Shwaner v. Dep't of the Army*, 696 F. Supp. 2d 77, 82–83 (D.D.C. 2010)
(permitting the withholding of "lists of certain Army personnel, their ranks, companies, and
addresses" when "[p]laintiff does not argue, nor does the Court find, that release of the withheld
information would shed any light on the Amy's performance of its duties"); *Schoenman v. FBI*,
575 F. Supp. 2d 136, 161 (D.D.C. 2008) (permitting the withholding of names of Department of
Defense employees when "[p]laintiff maintains that the names . . . would make for more accurate
and detailed historical accounts. [Plaintiff] does not argue, nor does the Court find, that the
withheld information would shed any light on the [agency's] performance of its statutory
duties"); *Kimmel v. U.S. Dep't of Defense*, 2006 WL 1126812, at *3 (D.D.C. March 31, 2006)
(permitting the withholding of the names of Department of Defense employees because "the

decisionmaking process by understanding the role played by different individuals at the Army. This is a public interest that will, in part, reveal how the agency is functioning. The Court therefore denies the Army summary judgment and grants Hunton partial summary judgment on the Army's redaction of names under Exemption 6.

### 5.  The Corps' Withholding of Documents as Non-Responsive

Hunton also objects to the Corps' use of a "non-responsive" label to withhold certain records. Both parties agree that the D.C. Circuit's recent decision established that there is "no statutory basis [in FOIA] for redacting ostensibly non-responsive information from a record deemed responsive." *Am. Immigration Lawyers Assoc. v. Exec. Office for Immigration Review*, 830 F.3d 667, 670 (D.C. Cir. 2016). Hunton has requested that the Corps re-review these records and release them unless they fall under an enumerated FOIA exemption, Pl.'s MPSJ Corps at 18–19, ECF No. 56, and the Corps has stated that it intends to "release the information [marked as non-responsive] to Plaintiff that is not otherwise subject to a FOIA exemption.," Corps Reply at 18, ECF No. 59. Hunton's motion for partial summary judgment is thus granted to the extent that the Corps is ordered to re-review and, if appropriate, release the records previously labelled as non-responsive.

### C.  Hunton's Request for Orders Documenting FOIA Violations

The Court denies Hunton's requests for orders documenting violations by the Corps and Army. "FOIA does not create a cause of action for an agency's untimely response to a FOIA request" beyond the ability to seek an injunction from the district court. *Bangoura v. U.S. Dep't of Army*, 607 F. Supp. 2d 134, 143 n.6 (D.D.C. 2009). Nor is declaratory relief appropriate.

---

court does not believe that releasing these individuals' names would shed any light on the subject of the FOIA request").

*Compare id.* (holding that defendant's response to plaintiff's FOIA request "without more, does not present a 'cognizable danger of recurrent violation' or 'an illegal agency policy'" sufficient to justify declaratory judgment), *with Nat'l Sec. Archive Fund, Inc. v. U.S. Dep't of Air Force*, No. 05-571, 2006 WL 1030152, at *1 (D.D.C. Apr. 19, 2006) (granting declaratory judgment against an agency that failed to answer numerous requests over a period of more than ten years).

## V.  CONCLUSION

For the foregoing reasons, the EPA's motion for summary judgment (ECF No. 40) is **GRANTED IN PART AND DENIED IN PART**, the Corps' motion for summary judgment (ECF No. 52) is **GRANTED IN PART AND DENIED IN PART**, the Army's motion for summary judgment (ECF No. 36) is **GRANTED IN PART AND DENIED IN PART**, Hunton's motion for an order governing further proceedings concerning the EPA (ECF No. 50) is **GRANTED IN PART AND DENIED IN PART**, Hunton's motion for partial summary judgment concerning the Corps (ECF No. 56) is **GRANTED IN PART AND DENIED IN PART**, and Hunton's motion for partial summary judgment concerning the Army (ECF No. 46) is **GRANTED IN PART AND DENIED IN PART**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 31, 2017                                    RUDOLPH CONTRERAS
                                                         United States District Judge